***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder or parties.
4. An employment relationship existed between the parties on May 15, 2000. Perdue Farms is the employer and Gene Outerbridge is the employee.
5. At all times relevant to this action, Perdue Farms is and was self-insured for the purposes of meeting the requirements of the Workers' Compensation Act of the State of North Carolina, and Crawford and Company is its adjuster. Additionally, at all relevant times, Perdue Farms employed three (3) or more employees for purposes of the Workers' Compensation Act.
6. The plaintiff's average weekly wage as of May 15, 2000, was $500.00, resulting in a weekly benefit amount of $336.35.
7. The plaintiff received salary continuation, at his full rate of pay, as part of an employer-sponsored, non-contributory disability plan, to which the employer is entitled to a credit in the amount of $13,000, from May 15, 2000 to November 30, 2000.
8. The parties submitted a package of documents as Stipulated Exhibit #1 that was received into evidence. That exhibit included documents and/or medical records from:
• Perdue Wellness Center (Pre-Accident)
• Perdue
• Pitt County Memorial Hospital
• Eastern Radiologist, Inc.
• Tarboro Clinic P.A.
• Bertie County Rural Health Center
• Pitt County Mental Health Center
• Carolina Regional Orthopaedics
• Heritage Hospital
• Martin General Hospital
• Center for Scoliosis Spinal Surgery
• Greenville MRI
• Dr. Rudolph Maier, M.D.
• Orthopaedic's East
• Pro Active Therapy
• Functional Capacity Evaluation
• Meggison Family Chiropractic
• IntraCorp Letter to Curtis C. Coleman, III
• IntraCorp Progress Notes
9. Stipulated Exhibit #2, which was also received into evidence, consisted of a written statement by Perdue outlining the payments to the plaintiff under the Defendant-employer's non-contributory disability plan referred to in paragraph 7, above.
10. As agreed upon at the hearing before the Deputy Commissioner, the parties also later submitted the Williamston Police Department Record of Collision dated June 30, 2000, and labeled as Exhibit #3, which details an automobile accident of that date, involving the plaintiff and Sharon Denise Goss.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was forty-nine years of age at the time of hearing before the Deputy Commissioner, and completed the tenth grade. Prior to his workplace injury on May 15, 2000, the plaintiff worked for Perdue Farms' Lewiston, North Carolina, facility for approximately sixteen years.
2. As of the date of injury on May 15, 2000, the plaintiff had been working as the assistant foreman in the dressing department for about two years. He performed various manual tasks for operating the equipment, including putting salt into the kill machine, putting the blade on the machine, making sure the scalders were at the right temperature, and winding the pickers. He would put blocks of salt, which weighed 15 to 25 pounds, into the kill machine. Occasionally he had to use bags of salt, which were somewhat heavier (around 50 pounds). Prior to this position, the plaintiff had done maintenance, repairing, and rebuilding of the machines in the evisceration department.
3. On May 15, 2000, the plaintiff suffered an admittedly compensable injury by accident to his low back when he slipped and fell onto his back while at work. The plaintiff testified that this fall took place in the "bird-eye room." The plaintiff reported the accident that same day and sought medical treatment from the employer's on-site medical facility. The accident was accepted as compensable.
4. The May 15, 2000, workplace injury was not the first time the plaintiff had injured his back. In 1991 and 1996, the plaintiff was involved in automobile accidents in which he injured his lower back. In 1991, the plaintiff suffered a low back injury and neck strain, and was out of work for more than three months. As a result of the 1996 automobile accident, the plaintiff experienced low back and right leg pain, which caused him to miss more than six months of work.
5. The plaintiff was seen the day of his slip and fall on May 15, 2000, by Dr. Keith Britt at the employer's on site medical facility, the Wellness Center. The plaintiff reported his slip and fall and complained of pain on the right side of his lower back. Dr. Britt assessed a right sacroiliac (SI) joint strain. Dr. Britt ordered x-rays of the SI joint, which showed mild sclerosis on the left side, which Dr. Britt attributed to the degenerative process, and no acute injury. Dr. Britt prescribed Naprosyn and Soma, and placed the plaintiff on modified duty with restrictions of no bending, twisting, or lifting over 5 pounds until further evaluation.
6. The plaintiff was seen again by Dr. Britt at the on site facility on May 17, 2000, complaining of increasing pain in the right lumbar/SI joint with increased pain radiating into his right leg. Dr. Britt continued the same work restrictions of "no bending, twisting, or lifting over five (5) pounds until 5-18-00" and planned to see the plaintiff the next day.
7. On May 18, 2000, the plaintiff returned to see Dr. Britt, complaining of increased pain in his back and down his posterior thigh. After evaluating the plaintiff, Dr. Britt continued to diagnose him with a lumbar strain, released him to return to modified duty work with the same restrictions, and provided him a return-to-work note indicating the same. Dr. Britt also referred the plaintiff to Dr. James Alexander, a back specialist, for further evaluation.
8. On May 18, 2000, the same date the plaintiff saw Dr. Britt, he also saw Dr. J. Morgan in Tarboro, North Carolina by his own volition. The plaintiff did not request or seek prior authorization from Perdue Farms or the Industrial Commission to see Dr. Morgan, even though the defendant was providing him with medical treatment for his injury. During this visit, Dr. Morgan wrote the plaintiff a note, taking him out of work until May 23, 2000. Perdue Farms informed the plaintiff that Dr. Morgan was not an approved treating physician who could write him out of work for his workplace injury.
9. In a letter dated May 26, 2000, the plaintiff's counsel requested that the Industrial Commission allow him to change physicians, from the care of Dr. Britt to that of Dr. Morgan. In an order filed June 19, 2000, the Industrial Commission denied the plaintiff's request to change treating physicians. The plaintiff did not appeal this decision or subsequently request that he be allowed to change treating physicians.
10. The plaintiff returned to see Dr. Britt on May 25, 2000, stating that his back problems were about the same. After evaluating the plaintiff's condition, Dr. Britt noted that, although he believed the plaintiff had merely suffered a strain, he again encouraged the plaintiff to see Dr. Alexander for further evaluation. Dr. Britt informed the plaintiff that he should return to modified duty work, as previously recommended, since bed rest would actually be worse for his back strain. Dr. Britt provided the plaintiff another return-to-work note, stating that his restrictions were "no bending, lifting, or twisting until evaluated on 5/31/00" and that the plaintiff "can pin feathers."
11. Immediately after Dr. Britt released the plaintiff to modified duty work, the plaintiff signed a modified duty agreement, indicating that he understood and agreed to continue working at Perdue Farms subject to restrictions of "no bending, twisting, or lifting over 5 lbs. until 5/22/00." The agreement that the plaintiff signed is a standard form, which the medical staff at Perdue Farms regularly use to identify any working restrictions that an employee may have. Despite the fact that the plaintiff signed the modified duty agreement and was repeatedly instructed from May 15 through May 25, 2000, by his approved treating physician, that he should return to modified duty work, the plaintiff refused to perform the work offered him within these restrictions.
12. Perdue Farms offered the plaintiff the position of feather pinner, which was within his work restriction. As feather pinner, the plaintiff would be responsible for inspecting birds as they pass by on an assembly line to make sure there are no feathers remaining on them. Although the majority of the feathers are removed by a machine, the feather pinner manually pulls out any remaining feathers with a dull knife, similar to a butter knife. This job can be done in either a seated or standing position. The feather pinning position is a regular, full-time position at Perdue Farms. The plaintiff performed this job for approximately forty-five minutes to an hour, but was unable to continue due to ongoing pain.
13. When plaintiff was unable to do the feather pinning job, Mr. Daniels sent him back to the Wellness Center, requesting confirmation from the plaintiff's doctors that the feather pinning position was within his restrictions and a job he could safely perform. In response, Dr. Britt provided the plaintiff an additional return-to-work note on May 25, 2000, specifically stating that the plaintiff could perform the feather pinning job.
14. In addition to the feather pinning job, Mr. Daniels offered the plaintiff two other positions which were within his restrictions: labeling pallets in the cooler area, and working as the back-up chicken killer. The plaintiff testified that he was unable to perform the job because he could not reach the pallets, and was told there was no work to be done there.
15. The position of back-up chicken killer, the third job Mr. Daniels offered to the plaintiff, can be performed in either a seated or standing position. However, the plaintiff did not feel he was capable of this job as well given his continued pain.
16. The plaintiff never returned to work at Perdue Farms or anywhere else after his May 15, 2000, injury.
17. On May 31, 2000, the plaintiff saw Dr. Alexander, who, like Dr. Britt, diagnosed the plaintiff with a right lumbar muscle strain. Although Dr. Alexander did not believe that the plaintiff's complaints were the result of any discogenic problems, Dr. Alexander took the plaintiff out of work for the remainder of that week only to further evaluate his condition. At no time, however, did Dr. Alexander determine that the plaintiff was totally disabled from working.
18. When the plaintiff returned to see Dr. Alexander on June 6, 2000, for reassessment of his back pain, Dr. Alexander released the plaintiff to return to modified duty work with instructions that he be permitted to walk, sit, or stand as desired for comfort. Dr. Alexander further recommended that the plaintiff see Dr. Ira Hardy, a neurosurgeon, for a second opinion, due to the plaintiff's noticeable distrust of the treatment that Dr. Alexander and Dr. Britt were providing.
19. Before scheduling an appointment with Dr. Hardy, the plaintiff was involved in an automobile accident on June 30, 2000. The accident increased the plaintiff's symptoms, causing him pain in his neck and left side of his lower back, which he claims was not hurting prior to the automobile accident. The next day, the plaintiff was seen at Martin General Hospital, where he was evaluated and underwent x-rays of his cervical spine, which were negative.
20. On July 19, 2000, the plaintiff saw Dr. David Miller of Carolina Regional Orthopaedics for his pain. Dr. Miller, like Dr. Morgan, was not an authorized treating physician for the plaintiff's workplace injury, and the plaintiff neither requested nor sought authorization from Perdue or the Industrial Commission to receive treatment from Dr. Miller. The plaintiff subsequently saw Dr. Meggison, a chiropractor, for the injuries caused by the June 30, 2000, automobile accident.
21. On July 24, 2000, the plaintiff saw Dr. Alexander and related to him the history of his recent automobile accident and resulting pain. The medical records indicate the plaintiff complained that he was experiencing pain all over his body and specifically in his neck, shoulders, both legs, and lower back. After examining the plaintiff and evaluating his new complaints, Dr. Alexander informed the plaintiff that there was modified duty work available for him, which allowed him to walk, sit, or stand as desired for comfort, and he again, recommended that the plaintiff return to work. The medical records further indicate that Dr. Alexander continued to encourage the plaintiff to see Dr. Hardy if he still desired a second opinion. The plaintiff continued his refusal to return to suitable work which was offered to him by the employer Perdue Farms.
22. On July 31, 2000, over one month after his automobile accident, the plaintiff saw Dr. Ira Hardy as recommended by Dr. Alexander. During this visit, Dr. Hardy noted that, according to the plaintiff, his discomfort had been present since the workplace injury and worsened as a result of his subsequent automobile accident. As a precaution, Dr. Hardy took the plaintiff out of work so that he could properly evaluate the plaintiff's condition. Dr. Hardy, however, did not determine that the plaintiff was totally disabled from working during this time.
23. Based upon Dr. Hardy's recommendation, the plaintiff underwent a lumbar myelogram and a CT scan. The lumbar myelogram showed no evidence of instability, and the CT scan generally revealed nothing more than degenerative changes in the plaintiff's back. When the plaintiff returned to see Dr. Hardy on August 16, 2000, Dr. Hardy reviewed the test results and noted that he could find nothing that would explain the plaintiff's continued back and right leg pain. He recommended that the plaintiff undergo another MRI, as well as a bone scan.
24. On September 6, 2000, the plaintiff returned to see Dr. Hardy, who reviewed the plaintiff's test results. He again noted only the mild degenerative changes previously noted, and all of the tests were essentially normal. Based upon these results, Dr. Hardy recommended that the plaintiff begin an aggressive physical therapy and back strengthening program, and undergo a functional capacity evaluation.
25. The plaintiff's medical records indicate that on September 18, 2000, the plaintiff saw Dr. Rudolph Maier, upon the referral of Dr. Meggison, as a result of his June 30, 2000, automobile accident. Neither Dr. Maier nor Dr. Meggison were authorized treating physicians in regard to the plaintiff's May 15, 2000, workplace injury, and the plaintiff never sought authorization from Perdue Farms or the Industrial Commission to receive medical treatment from these physicians.
26. During his visit with Dr. Maier, the plaintiff complained of pain in his neck, right arm, and low back. The plaintiff reported to Dr. Maier that he believed his June 30, 2000, automobile accident had caused pain on the left side of his lower back, but had little or no effect on the right side of his lower back, which he attributed to his workplace injury.
27. Based upon this information from the plaintiff, Dr. Maier opined that the pain in and around the sacroiliac joint on the right side was caused by the plaintiff's workplace injury, while the rest of the plaintiff's pain was due to his subsequent automobile accident. Dr. Maier subsequently referred the plaintiff to therapy and ordered injections to the sacroiliac joint. The plaintiff continued to treat with Dr. Maier through August 2002. During this time, his condition did not change significantly and the treatment provided little sustained pain relief.
28. On September 21, 2000, the plaintiff presented to Orthopaedics East in Greenville, North Carolina, where he was seen by Dr. Christopher Hasty. The recorded history shows that the plaintiff reported his slip and fall at work, but apparently made no mention of the subsequent motor vehicle accident of late June. Upon examination, Dr. Hasty found no significant orthopaedic pathology for the plaintiff's alleged back pain and recommended that he continue in the work-hardening program. The next day, the plaintiff underwent a functional capacity evaluation, which showed he was capable of light-duty work.
29. On November 29, 2000, the plaintiff returned to see Dr. Hardy for a final evaluation. After examining the plaintiff, Dr. Hardy concluded that the plaintiff had suffered a lumbrosacral strain as a result of his May 15, 2000, slip and fall at work, but that his workplace injury was complicated by his subsequent automobile accident on June 30, 2000. Dr. Hardy found no evidence, however, of a ruptured or protruding disc, any neurological deficit, or nerve root compression. Dr. Hardy determined that as of that date, the plaintiff had reached maximum medical improvement and retained a five percent (5%) permanent impairment rating to his back. Dr. Hardy released the plaintiff from his care and restricted him to sedentary work.
30. Since his May 15, 2000, injury the plaintiff has not held or sought any employment. At the time of the hearing before the Deputy Commissioner, the plaintiff had applied for Social Security disability benefits and was appealing the decision denying him benefits. Additionally, the plaintiff testified that he has been supporting himself with the settlements he received as a result of the November 1998 and June 2000 automobile accidents.
31. The greater weight of the evidence, including the medical evidence of record and the plaintiff's failed attempts to return to work, establishes that the plaintiff was unable to work from May 15, 2000, the date of his injury, through his release from Dr. Hardy on November 29, 2000. Thereafter, plaintiff has been capable of sedentary work, as recommended by his treating physicians.
32. The greater weight of the evidence also shows that the plaintiff is entitled to compensation for the five percent impairment rating to his back, assessed by Dr. Hardy. Although Dr. Maier gave the plaintiff a seven percent rating to the back, the Full Commission gives greater weight to Dr. Hardy, because he was the plaintiff's authorized treating physician.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of the employment on May 15, 2000. As a result of the compensable injury, the plaintiff suffered injury to his back. N.C. Gen. Stat. § 97-2(6).
2. The plaintiff is entitled to temporary total disability compensation from May 15, 2000, the date of injury, through his release from Dr. Hardy on November 29, 2000. N.C. Gen. Stat. § 97-29.
3. The plaintiff is entitled to permanent partial disability compensation at the rate of $336.35 per week for 15 weeks (a total amount of $5,045.25), for the five percent permanent partial disability rating to his back. N.C. Gen. Stat. § 97-31(23).
4. The plaintiff is entitled to medical treatment from his authorized treating physicians, as reasonably necessary to effect a cure, give relief, or lessen his period of disability. N.C. Gen. Stat. § 97-2(19) and 97-25.
5. The defendant is entitled to a credit for any salary continuation paid to the plaintiff during the period in which he has been awarded temporary total disability compensation as provided herein. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendant shall pay to the plaintiff temporary total disability compensation from May 15, 2000, the date of injury, through his release from Dr. Hardy on November 29, 2000, subject to the attorney's fee provided herein. Because this amount has accrued, the defendant shall pay the plaintiff in lump sum.
2. The defendant shall pay to the plaintiff permanent partial disability compensation at the rate of $336.35 per week for 15 weeks (a total amount of $5,045.25), for the five percent permanent partial disability rating to his back, subject to the attorney's fee provided herein. Because this amount has accrued, the defendant shall pay plaintiff in lump sum.
3. The defendant shall provide plaintiff with medical treatment from his authorized treating physicians, as reasonably necessary to effect a cure, give relief, or lessen his period of disability.
4. The defendant shall be credited for any salary continuation paid to the plaintiff during the period in which he has been awarded temporary total disability compensation as provided herein.
5. The defendant shall pay directly to plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent of the compensation awarded in paragraphs 1 and 2 of this Award. Because the compensation upon which this fee is based has accrued, defendant shall pay plaintiff's counsel in lump sum.
6. Defendant shall pay the costs.
This 8th day of August 2005.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER